IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BRUCE W. REYNOLDS,⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀⠀⠀CV 06-1255-KI
⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
MICHAEL J. ASTRUE, Commissioner of Social⠀)⠀⠀⠀⠀OPINION AND ORDER
Security,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀)

KING, District Judge:

## **INTRODUCTION**

Plaintiff Bruce Reynolds brings this action for judicial review of a final decision of the Commissioner of Social Security denying his application for supplemental security income payments (SSI) under Title XVI of the Social Security Act. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3). The Commissioner's decision is reversed and remanded for an award of benefits.

## BACKGROUND

Reynolds was born on July 1, 1955. Tr. 73[1]. He completed high school and received some training at the fire academy. Tr. 84, 347. Reynolds worked as a fish processor and lumber yard worker. Tr. 79, 310. He was in a motor vehicle accident in 1972 which resulted in a skull fracture, head injury, and broken neck. Tr. 151. Reynolds alleges disability due to seizure disorder, hearing loss in the right ear, chronic neck pain, memory and concentration problems related to a cognitive disorder, and personality disorder secondary to head injury. He filed for SSI on August 8, 2003, and his application was denied initially and on reconsideration. A hearing was held before an Administrative Law Judge (ALJ) on January 19, 2006. She issued a decision on April 26, 2006, finding Reynolds not disabled which is the final decision of the Commissioner.

## DISABILITY ANALYSIS

The initial burden of proof rests upon the claimant to establish disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir. 1995). To meet this burden, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months. . . ." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner has established a sequential process of up to five steps for determining whether a person over the age of 18 is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 416.920. If the adjudication proceeds beyond step three, the Commissioner must assess the claimant's residual functional capacity (RFC). The claimant's RFC

---

[1] Citations to "Tr." refer to the page(s) indicated in the official transcript of the administrative record filed with the Commissioner's Answer.

is an assessment of the sustained work-related activities the claimant can still do on a regular and continuing basis, despite the limitations imposed by his impairments. 20 C.F.R. § 416.945, Social Security Ruling (SSR) 96-8p. Reynolds challenges the ALJ's determination of his RFC. At step four, the Commissioner must determine whether the claimant retains the RFC to perform work he has done in the past. The ALJ found Reynolds could not perform his past work.

When the adjudication reaches step five, the Commissioner must determine whether the claimant can perform any work that exists in the national economy. *Bowen v. Yuckert*, 482 U.S. at 142; 20 C.F.R. § 416.920(g). Here the burden of production shifts to the Commissioner to show that a significant number of jobs exist in the national economy that the claimant can do. *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir 1999). If the Commissioner meets this burden, then the claimant is not disabled. 20 C.F.R. § 416.966. Reynolds challenges the ALJ's finding that he can perform other work in the national economy and is not disabled.

## THE ALJ's FINDINGS

The ALJ found Reynolds had the severe impairments of cognitive disorder, personality disorder, and degenerative joint disease of the cervical spine. Tr. 15. She determined Reynolds' seizures were "stable when he remained on medication" and not severe. *Id.* The ALJ determined Reynolds' impairments did not meet or equal the criteria for a listed impairment enumerated in 20 C.F.R. Pt. 404, subpt. P, app. 1 (Listing of Impairments). Tr. 16. She found Reynolds retained the RFC to "perform only occasional overhead reaching. He can perform simple, routine tasks with little variation in job duties. He cannot perform detailed tasks. He cannot perform fast-paced tasks. He has no exertional limits. He cannot have close interaction with the general public." *Id.* The ALJ found Reynolds could not perform his past work. Tr. 27.

The ALJ elicited testimony from an impartial vocational expert (VE).  Tr.  327-331.  The ALJ asked the VE whether an individual of Reynolds' age, education and experience was capable of making an adjustment to other work.  The VE replied Reynolds could perform jobs that exist in the national economy including cleaner, commercial-institutional; photocopy machine operator, and marker.  The ALJ found Reynolds could perform work that exists in significant numbers in the country and was not disabled within the meaning of the Social Security Act.  Tr.  28.

## STANDARD OF REVIEW

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Batson v. Commissioner of Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). "Substantial evidence means . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).

The ALJ is responsible for resolving conflicts in the medical evidence and determining credibility.  *Edlund v. Massanari,* 253 F.3d 1152, 1156 (9th Cir. 2001).  If the evidence can reasonably support either affirming or reversing the Commissioner's conclusion, the court may not substitute its judgment for that of the Commissioner. *Batson v. Commissioner of Soc. Sec. Admin.*, 359 F.3d at 1193.  The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision.  *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, even if the "evidence is susceptible to more than one rational interpretation."  *Andrews v. Shalala*, 53 F.3d at 1039-1040.

## DISCUSSION

Reynolds asserts the ALJ improperly determined his RFC by rejecting the opinion of the examining psychologist. He also asserts the ALJ failed to properly assess the lay witness testimony and his credibility. Reynolds contends the jobs suggested by the VE exceed the RFC developed by the ALJ. He argues the Commissioner failed to meet his burden at step five and show there were jobs he could perform.

## I.    Medical Background

Reynolds was taken to the emergency room at Pacific Community Hospital on February 15, 1999, following two seizures, one with incontinence. Dr. Steward, the emergency room physician, noted Reynolds was postictal[2] and had not taken anti-seizure medications since 1991. He also noted Reynolds was disabled, had bilateral weakness in his lower extremities and was using a wheelchair intermittently. Tr. 163-164. A CT scan showed very extensive encephalomalacic volume loss in

---

[2] There are two broad groups of seizures - primary generalized seizures and partial seizures. Primary generalized seizures include absence seizures which are short periods when the individual will stare, and has little or not awareness or responsiveness. The individual is responsive and alert following the seizure and usually does not know a seizure has occurred. Another type of generalized seizure is tonic-clonic seizure, which is a convulsive seizure (grand mal) and the individual will lose consciousness. These seizures can last one to three minutes and incontinence may occur. Following the seizure the individual is usually tired and confused, but may be agitated or depressed. This is the postictal period and can last for minutes or hours.

Partial seizures can be simple or complex. A person can remain alert and able to respond during a simple partial seizure. However, complex partial seizures result in impairment in the ability to pay attention or respond, and the person often does not recall what happened during the seizure. A third type of partial seizure is one that evolves into a generalized convulsive (grand mal) seizure. *Definition of Seizures and Epilepsy*, NYU Comprehensive Epilepsy, www.neurologychannel.com/nyu/definition.htm. Last viewed July 30, 2007; WebMD Medical reference from the Cleveland Clinic, www.medicinenet.com/seizure_symptoms_and_type/article.htm. Last viewed July 30, 2007.

both frontal regions, substantially greater on the right side, with no acute process or hemorrhage. Tr. 165-166.

On June 1, 1999 Reynolds was again admitted to Pacific Community Hospital. Dr. Steward noted Reynolds had been drinking that evening and had a tonic clonic type seizure with postictal state and somnolence secondary to medication. Tr. 149-150. Dr. Gilchrist, the admitting physician, noted a past history of a motor vehicle accident with skull and neck fracture, status post calvarial prosthesis in1972, shoulder tendonitis, and seizure disorder. Dr. Gilchrist noted Reynolds was unconscious during the seizures which were followed by postictal phase. He also noted Reynolds had headaches and had a blood alcohol level of .05. Tr. 148, 151-153. Dr. Gilchrist further noted Reynolds had three grand mal seizures - one at home, one in the emergency room, and one after admission to the hospital. He found the CT scan showed right side atrophy and encephalomalacia. Tr. 148. The CT scan report noted new extensive sinusitis findings most prominent in the left maxillary. The report noted no intracranial change or acute process. The report described the previous finding of extensive postoperative encephalomalacic volume loss, most prominent in right frontal region with bilateral craniotomy flaps and a large area of absent cranial vault on the right side. Tr. 154-155.

Reynolds was taken to Pacific Community Hospital on October 8, 2000, following another grand mal seizure. Dr. Steward noted the paramedics described a postictal period. Reynolds' blood panel was negative for alcohol and drugs. Dr. Steward recommended an increase in his anti-seizure medication and follow up with Dr. Gilchrist. Tr. 141-142.

Dr. Sayre, a physician at Pacific Community Hospital, began treating Reynolds in 2001 and noted his history of seizure disorder and Reynolds' drug and alcohol screens were negative. Tr 223-

224.  He treated Reynolds in 2002 for low back pain following a seizure.  Tr.  222.  In July 2003,

Dr. Sayre noted Reynolds had difficulty expressing himself due to cognitive dysfunction secondary

to brain trauma.  He noted the cognitive disability was complicated by the combination of right ear

hearing problems and aphasia.[3]  Dr.  Sayre referred Reynolds to a job center for disability help and

to Dr. Richardson for neuropsychological testing.  Tr.  219-220.

Dr.  Richardson, a neuropsychologist, conducted an examination of Reynolds in August

2003.  Tr.  169-173.  He noted Reynolds was referred by the Community Human Services Program

of Oregon and Dr. Sayre.  Dr.  Richardson conducted several tests, including the Wide Range

Achievement Test-III, the Wechsler Adult Intelligence Scale-III, the Wechsler Memory Scale-III, the

Amen Clinic ADD Subtype Questionnaire, the Minnesota Multiphasic Personality Inventory-2

(MMPI-2), the Millon Clinical Multiaxial Inventory-III, and the Maryland Addiction Questionnaire.

Tr.  172.  He found Reynolds had an of IQ 108, but his general memory was in the borderline range,

with auditory and visual memory impairments.  Dr.  Richardson noted Reynolds had problems with

attention, focus, mood swings and compulsive tendencies.  He noted the MMPI-2 test was invalid

and the Millan test showed debasement and depression.  Dr.  Richardson also noted the Millan test

suggested a thought disorder and delusional tendencies.  *Id.*

Dr.  Richardson concluded Reynolds had memory impairment.  He noted that despite the

head injury, Reynolds retained a high level of intellectual functioning and academic skill.  Dr.

Richardson also had "significant concerns" that there was a specific mood disturbance that related

---

[3]Aphasia is a neurological disorder caused by damage to the brain that results in language
and communication problems.  *Stedman's Medical Dictionary*, (28th ed. 2006); National Institute
of Neurological Disorders and Stroke, National Institutes of Health,
www.ninds.nih.gov/disorders/apahsia/aphasia.htm.  Last viewed July 30, 2007.

to subtle neuropsychiatric issues.  He also noted that Reynolds suffered from reactive depression which might indicate "he is aware of some level of impairment."  Tr.  172-173.  Dr.  Richardson recommended medications for mood stabilization and control of emotional outbursts.  He diagnosed Mental Disorder, NOS, secondary to head trauma; Cognitive Disorder, NOS (definite indications of impairment in visual memory); Personality Disorder NOS (avoidance, schizotypal, paranoid, borderline, passive-aggressive, and aggressive traits).  Dr.  Richardson assigned Reynolds a Global Assessment of Functioning (GAF) of 52.[4]  He noted it would be good for Reynolds' self-esteem to find some kind of work he could excel in, but, prior to that, mood stabilization would be required.

Reynolds was treated on October 10, 2003, at the Samaritan Toledo Clinic for neck and shoulder pain by Physician Assistant (PA) Gosvenor.  He noted Reynolds had chronic neck pain with left cervical spine paraspinal spasms of more than one year; cognitive disability from a motor vehicle accident; and chronic right shoulder pain with pain radiating to hands and arm.  Gosvenor ordered x-rays and prescribed Skelaxil.  Tr.  215-218.  The cervical x-rays showed mild degenerative joint disease at C4-5 with moderate spondylosis; C7 vertebral body deformity consistent with a history of neck fracture with mild surrounding spur formation at the C6-7 level.  The right shoulder x-ray indicated mild acromioclavicular degenerative joint disease and mild calcific bursitis.  Tr.  213-214.  After follow up treatment with PA Bassingthwaite in November 2003, Reynolds was referred to an orthopedic specialist.  Tr.  211-212.

---

[4]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers) The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

Dr. Bynum, an orthopedic specialist, began treating Reynolds in January 2004. Tr. 240-241. He noted some gripping problems, positive impingement signs, weakness related to pain, and diminished sensation in the upper arm. Dr. Bynum noted x-rays indicated degenerative changes at C4-5, and C6-7 with disc narrowing and prominent anterior osteophyte formation. He also noted a bioconcave deformity of C-6 vertebral body consistent with the history of prior fracture. Dr. Bynum further noted shoulder x-rays indicated a narrowing of the acromioclavicular (AC) joint with prominent superior osteophyte formation; a type two acromion, and maintenance of acromiohumeral distance and glenohumeral cartilage space. He ordered EMG and nerve conduction studies and prescribed rotator cuff strengthening exercises. Tr. 240-241.

In January 2004, PA Bassingthwaite noted Reynolds had right hand pain and numbness; and decreased range of motion (ROM) in the right shoulder with pain. She diagnosed right carpal tunnel syndrome (CTS) associated with cervical spondylosis and right shoulder bursitis. Bassingthwaite recommended follow up with a neurosurgeon and orthopedic physician, and prescribed medication and a brace. Tr. 209-210. Dr. Bynum treated Reynolds in February 2004, for right shoulder pain, right arm pain and paresthesias. He recommended electro-diagnostic tests, and continued exercises. Dr. Bynum noted Reynolds believed he was getting enough exercise from caring for an infant. Tr. 236-237.

In March 2004, Dr. Bynum treated Reynolds for neck and right shoulder pain, parathesias in right hand, and diminished sensation in little fingers. He noted the electro-diagnostic studies indicated severe bilateral distal median neuropathy. Dr. Bynum diagnosed chronic neck pain secondary to multiple spondylosis; chronic right shoulder pain which was caused by referred pain from cervical spine, degenerative AC joint arthritis, and rotator cuff tendonitis. He found Reynolds

had bilateral CTS and his right arm pain may be related to CTS.  Dr.  Bynum recommended physical

therapy, a CTS splint, and consideration of CTS release surgery.  Tr.  234-235.

Dr. Keller, a neurologist, began treating Reynolds in June 2004.  She noted his 1972 accident

caused "significant skull fracture and had a craniotomy with a plate put in.  At that time the patient

suffered significant head trauma but never developed epilepsy."  Tr.  231-232.  Dr.  Keller noted

Reynolds had his first seizure like "shakings" in 1978 and now has partial seizures.  She also noted

that Reynold was prescribed Dilantin for seizures.  However, Reynolds developed stomach problems

and his medication was switched to Tegretol.  Dr.  Keller further noted Reynolds had increased

problems in the last four to five years with emotional lability,[5] memory problems, forgetfulness, and

depression.  She ordered an EEG and noted Reynolds' mental health worker believed a switch to

Depakote for his mental health issues would be good.  However, Dr.  Keller determined Depakote

was not appropriate to control Reynolds' seizures and prescribed Depakote and a continuation of

Tegretol.  Tr.  231-232.

Dr. Bynum treated Reynolds in June 2004, and noted the electro-diagnostic studies indicated

severe bilateral CTS and thenor atrophy.   He recommended CTS release surgery to prevent

progression and permanent changes.  Dr.  Bynum noted Reynolds wanted to delay a month as he was

taking part in a musical performance.  Dr.  Bynum noted a delay of three to six months was

acceptable as long as Reynolds' symptoms did not worsen.  He advised Reynolds to use left splint

---

[5]Emotional lability refers to uncontrolled mood or behavioral expression of emotion.  The behavioral expression is often inappropriate and is most common after brain injury or degeneration. *Stedman's Medical Dictionary* (28th ed. 2006); National Center for Brain Injury, National Institutes of Health, www.ncbi.nlm.nih.gov/sites/entrez?cmd=Retrieve&dt.  Last viewed July 20, 2007.

and right CTS surgery would be scheduled first.  Dr.  Bynum also diagnosed chronic neck pain secondary to multi-level spondylosis, and chronic right shoulder pain.  Tr.  229-230.

In June 2004, Dr. Keller noted Reynolds' EEG was "abnormal due to increased spike activity in the right greater than left temporal region.  This is consistent with epileptiform activity."  Tr.  226. She noted his seizures were stable with the medication, but Reynolds was having some behavior management and mood issues.  Tr.  228.  Dr.  Keller noted in September 2004, that Reynolds' epilepsy was stable but he had spells of "being out of it," which he was unable to recall.  She also noted the Depakote was helping control some of his anger problems.  Tr.  269.

Dr. Bynum noted on October 18, 2004, that tests indicated Reynolds had bilateral CTS with significantly prolonged distal latency and surgery was needed immediately to prevent permanent damage.  He noted a full recovery may not occur.  Tr.  268.  Dr. Bynum performed CTS release surgery on Reynolds' right hand on November 1, 2004, and scheduled CTS release surgery for Reynolds left hand.  Tr.  264-266.  Dr.  Bynum performed successful left CTS release surgery on January 20, 2005.  Tr.  262-263.

Dr.  Cowan, at the  Samaritan Toledo Clinic, treated Reynolds for a cellulitis infection in the left arm in December 2004.  Tr.  276-283.  In September 2005, Dr.  Cowan treated Reynolds for neck pain and noted diagnoses of seizure disorder, personality disorder, and cognitive and memory problems.  Tr.  274-275.  Reynolds' attorney sent a form to Dr. Cowan requesting his observation of Reynolds' neck pain and other symptoms.  Dr.  Cowan replied he made no observation of neck pain or mental health issues.  He noted he treated Reynolds primarily for an infection and reviewed previous medical records.  Dr.  Cowan stated he was unable to complete the form.  Tr.  289-294.

The Oregon Department of Human Services referred Reynolds to Dr. Richardson for further testing in December 2004, to determine Reynolds' current level of function. Dr. Richardson noted Reynolds had neurologic impairment. In comparing current testing with the previous testing, he noted a deterioration in visual immediate memory. Dr. Richardson also found the Yale Brown Obsessive Compulsive Scale showed multiple obsessions and compulsions in various areas. He noted the Amen Clinic ADD Subtype Questionnaire showed definite indications of impaired attention span and concentration with mixed features.

Dr. Richardson found Reynolds' performance on the Weschler Memory Scale-3 showed "Memory in the extremely low range at Index Score of 66 (1 percentile). Visual Immediate Memory was also in the extremely low range at an Index Score or 68 (2 percentile)." Dr. Richardson also found the MMPI - 2 still invalid. He noted Reynolds exhibited behaviors suggestive of prefrontal cortex difficulties and recommended a SPECT scan to determine if there was organic impairment of function related to impulse control. Dr. Richardson diagnosed Mental Disorder NOS, secondary to head trauma; Cognitive Disorder, NOS (definite indications of impairment in visual memory); Personality Disorder, NOS, (avoidance, schizotypal, paranoid, borderline, passive-aggressive and aggressive traits); and a current GAF of 45.[6] Tr. 246-251.

Dr. Richardson wrote a letter to Reynolds' attorney in February 2005, regarding the MMPI-2 score. He noted that an elevated F scale on the test can indicate an individual with multiple impairments is in crisis, exaggeration of symptoms, or over reporting of symptoms. Dr. Richardson

---

[6] GAF of 41 to 50 indicates serious symptoms (suicidal ideation, severe obsessional rituals frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job). The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed. 2000).

noted it was inappropriate to use an elevated F scale to conclude whether or not disabilities are supported or negated; so he did not interpret it.  He also stated it did not reflect an attempt by Reynolds to manipulate the assessment.  Tr.  253.

Dr.  Richardson completed a medical source statement on December 28, 2004.  He noted Reynolds had moderate limitations in the ability to remember locations and work like procedures. Dr.  Richardson noted moderately severe limitations in the ability to understand and remember very short simple instructions.  He found severe limitations in Reynolds ability to understand or carry out detailed instructions.  Dr.  Richardson also noted Reynolds had severe limitations in his ability to maintain concentration for extended periods.  He further noted severe limitations in Reynolds' ability to complete a workday without interference from psychological symptoms or to perform at a consistent pace.  Finally, Dr. Richardson noted Reynolds had a substantial loss of ability to understand, remember, and carry out simple instructions.  Tr.  242-245.

Dr.  Keller noted in February 2005, that Reynolds seizures were controlled with medications and his problems were behavioral health issues and anger management.  Tr. 260.  In September, 2005, Dr.  Keller again noted Reynolds epilepsy was controlled with medication and his problems were behavioral and emotional control.  Tr.  257.

Dr.  Bynum completed a form for Reynolds' attorney in December 2005.  He noted he had insufficient information to respond to many of the questions.  Dr.  Bynum noted he know of no reason Reynolds would need to lie down during the day.  He also noted Reynolds would have good days and bad days.  Dr.  Bynum stated he treated Reynolds for CTS and neck pain and did not know if he was malingering.  Tr.  285-288.  Dr.  Richardson wrote a letter to Reynolds' attorney in February 2006.  He noted,

I have reviewed the EEG report by Dr. Cecilia Keller dated 06/18/2004 as well as the Diagnostic Imaging Report from Pacific Communities Hospital.  The report is consistent with the statements made by Mr. Reynolds during the evaluation I performed as well as collateral information from others relating to Mr. Reynolds' behavior prior to examination.  Based on these findings, the presence of absence seizure activity does appear to be supported.  As is true of several other conditions which can episodically interfere with attention and concentration, this condition my not be present at the time of cognitive testing . . . attention and concentration can be episodically impaired by intrusion of neurologic events such as seizures, by systemic conditions such as sleep deprivation or fatigue conditions, and by psychiatric conditions such as the rumination withing obsessive compulsive disorder or mood disorder.  At the very least, the absence events would impact his ability to function.  These events are sometimes not seen by patients as seizure events since they do not present as grand mal or petit mal, thus, being omitted from disclosure to the treating neurologist.  Given this information, it is imperative that Mr. Reynolds not drive or use machinery until cleared through his neurologist.

Tr.  296.  There are no later medical reports in the record.

## II.    RFC Determination

Reynolds asserts the ALJ erred in her assessment of Dr. Richardson's two examination reports, medical source statement, and letter.  If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. *Lester v. Chater*, 81 F3d 821, 830 (9th Cir 1995).  If contradicted by another physician, the ALJ may reject the opinion by providing specific and legitimate reasons supported by substantial evidence in the record.  *Id.* at 830-831.  The opinion of a non-examining physician by itself does not constitute substantial evidence to reject the opinion of a treating or examining physician.  *Id.* at 831.  It may, however, constitute substantial evidence when it is consistent with other evidence in the record.  *Andrews v. Shalala*, 53 F.3d at 1041.

Dr.  Richardson's diagnoses were not contradicted.  However, Dr.  Crossen, the medical expert (ME) who testified at the hearing, disagreed with level of functional limitations Dr.

Richardson reported in his medical source statement.    The ALJ rejected Dr.  Richardson's

examination report of August 2003, stating,

> The undersigned notes claimant's somewhat exaggerated statements of symptoms,
> as noted by Dr. Richardson.  The GAF is inappropriately low, given claimant's
> functioning as indicated by the longitudinal record.  Claimant did not tell Dr.
> Richardson about his drumming or that he took care of an infant.  Claimant does not
> have all of the impairments that Dr.  Richardson assessed.

Tr.  24.  The ALJ specifically noted Dr.  Richardson's statement, "There appears to be a substantial

inconsistency between his disclosure of symptoms and his verbalization of those symptoms."  Tr.

23, 171.  Dr.  Richardson went on to state, "As noted before his verbalizations during the mental

status examination varied with disclosures when having to process the information in writing."  Tr.

171.  Dr. Sayre noted Reynolds had problems verbalizing his condition and suspected Reynolds had

aphasia and other cognitive impairments.  This was the reason he referred Reynolds to Dr.

Richardson. Dr.  Richardson found Reynolds had cognitive impairments.  There is no indication Dr.

Richardson found Reynolds verbalization difficulties to be "exaggerated statements of symptoms,"

rather than an indication of Reynolds' cognitive impairment.

    The ALJ's other reasons for rejecting this report are also not persuasive.  The ALJ stated the

GAF score on the report was inappropriately low due to Reynolds' longitudinal functioning.  Even

if this were true, the report specifically noted the GAF is a *current* score.  *Id.*  Although the ALJ

stated Reynolds did not tell Dr.  Richardson about his drumming or child care, it is unclear if that

is significant or even true.  There is nothing in the record to indicate Reynolds' drumming was

extensive.  Reynolds reported drumming a few hours a week in October 2003, and his fiancee noted

he could not "keep a beat as well" while drumming." Tr.  97, 108.  Dr. Bynum noted in June 2004,

that Reynolds wanted to delay carpal tunnel surgery until after a July 4th drumming performance,

which Dr. Bynum approved. Tr. 229-230. Reynolds testified in January 2006, he was going to start to play the drums with his church group during service. Tr. 305. The ALJ does not explain why this level of "drumming activities" would change Dr. Richardson's opinion, which was based on the results of testing and examination.

Dr. Richardson's initial examination was in August 2003. The record includes a statement from Reynolds' fiancee dated October 12, 2003, noting he helped change diapers, feed, and play with their baby. Tr. 105. Dr. Bynum noted Reynolds was involved in caring for an infant in February 2004. Tr. 237. There is no evidence of significant childcare at the time of Dr. Richardson's initial examination.

The ALJ's statement that Reynolds did not have all of the impairments found by Dr. Richardson is also without basis. Dr. Richardson is a specialist who conducted extensive psychological testing. Specialists are generally given more weight than non-specialists. 20 C.F.R. 416.927(d)(5), *Benecke v. Barnhart*, 379 F.3d 587, 594, n.4 (9th Cir. 2004). The ALJ is not qualified to make medical diagnoses. 20 C.F.R. § 416.913.

In addressing Dr. Richardson's second examination of Reynolds in late December 2004, the ALJ stated Reynolds "told Dr. Richardson he last used alcohol in 2003, which is inconsistent with his June 2004 statement to Dr. Keller that he drank a six-pack per week." Tr. 24. However, Dr. Richardson's report states, "he does not drink hard alcohol anymore, although he will have beer occasionally." Tr. 247. The ALJ also stated Reynolds complained of neck pain to Dr. Richardson but had reported to Dr. Bynum in the summer of 2004 that his neck pain was resolved. Tr. 24. The medical record, however, shows Reynolds was noted to have chronic neck pain and diagnosed with neck pain secondary to multiple spondylosis in medical reports from 2003 to September 2005. Tr.

211-212, 215-218, 229-230, 234-235, 240-241, 274-275.  The ALJ should not search the record to

find an inconsistency to support her finding and ignore all of the competent and substantial evidence

that suggests the opposite conclusion.  *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984);

*Holohan v. Massanari*, 246 F.3d 1195, 1205, (9th Cir. 2001).

      The ALJ again stated the record did not support "that claimant has a mental disorder not

otherwise specified."  Tr. 25.  Dr. Richardson diagnosed mental disorder secondary to head trauma,

cognitive disorder with definite indications of impairment in visual memory, and personality

disorder.  Dr. Crossen testified,

> Q:  In terms of mental disorders and impairments, doctor, do you have sufficient
> information to offer opinions:
> A:  Yes.
> Q:  Okay.  What diagnosis do you feel is supported by the record as a whole?
> A:  The 12.0 - I'm trying to remember, 12.02 or 12.03 is the one that has the *organic
> mental disorder*.
> Q:  I think that's 02.
> A:  Okay.  I guess I use up my last (INAUDIBLE), but I think I can remember most
> of the categories on that, 12.02 and the memory impairments and the personality
> changes (INAUDIBLE) there.  There's a personality disorder diagnosed by Dr.
> Richardson, and I guess the features there are avoidance, social avoidance, and some
> self-defeating patterns of behavior.
> Q:  Any others?
> A:  No.
> Q:  Do you feel he meets or equals any of the listings?
> A:  No, I don't.  I think that there's definitely some impairments, but I don't think
> they rise to the level of meeting the B criterion.

Tr. 318. (emphasis added).  The only real disagreement between Dr. Richardson and Dr. Crossen

relates to the degree of limitations caused by Reynolds' impairments.

      The ALJ also gave little weight to Dr. Richardson's assignment of a GAF of 45, which

indicates serious symptoms, because Reynolds "did not inform Dr. Richardson of some of his

activities, and Dr. Richardson got the mistaken impression that claimant was severely limited.  Tr.

17 - OPINION AND ORDER

25.  The ALJ again noted Reynolds' "extensive drumming."  *Id.*  She incorrectly discounts Dr.

Richardson's opinion, which is based on extensive psychological testing, for her own lay opinion.

The ALJ also noted Reynolds had an elevated F scale on the MMPI-2 test, stating, it "usually

indicates the test taker exaggerated his problems."  *Id.*  Dr. Richardson wrote a letter in February

2005 regarding the F scale on the MMPI-2.  Dr Richardson stated,

> The elevated F-scale can potentially show an individual who is in severe crisis with
> multiple impairments or be the result of exaggeration, or an attempt to over report
> pathology.  Therapeutically the material may be useful, the use of a profile with such
> a high elevation in the F-Scale would be inappropriate to use as a method of
> concluding whether or not a person's disabilities are either supported or negated.
> Therefore, the Minnesota Multiphasic Personality Inventory-2 was not interpreted.
> It does not reflect the way that Mr. Reynolds was attempting to manipulate the
> assessment in any way.  It is best protocol to omit the results . . .

Tr. 253.  The ALJ stated the record did not show Reynolds was in crisis and found the elevated F

scale "negatively affects claimant's credibility."  Tr. 25.  She also stated, "While Dr. Richardson

did not interpret this test due to its over reporting and invalidity, he failed to consider the claimant's

exaggeration also affected her (sic) self-reports upon which Dr. Richardson did use."  *Id.*  Dr.

Crossen did not testify regarding the F scale and Dr. Richardson's letter regarding its meaning is not

controverted.  Nevertheless, the ALJ disregarded Dr. Richardson's uncontradicted opinion regarding

proper interpretation of this part of the test.

Dr. Richardson also wrote a letter in February 2006 regarding Reynolds ability to drive or

operate machinery.  Tr. 296.  He stated he had reviewed the EEG report from Dr. Keller and

previous imaging studies.  Dr. Richardson found the studies consistent with his report and consistent

with the presence of "absence seizures" which can cause momentary lapses in the ability to

concentrate or remember.  Dr.  Richardson urged Reynolds to get clearance from his neurologist before driving or operating machinery.  *Id.*

The ALJ gave little weight to the letter stating Dr.  Keller had found Reynolds stable and not limited from driving.   However, Dr.  Keller's notes regarding the EEG state, "abnormal due to increased spike activity in the right greater than left temporal region.  This is consistent with epileptiform activity."  Tr.  226.  She noted his seizures were stable with the medication, but Reynolds was having  behavior health management and mood issues.  Tr.  228.  Dr.  Keller also noted Reynolds' epilepsy was stable but he had spells of "being out of it." which he did not remember.  Tr.  269.  The ALJ also stated Dr.  Richardson's letter was solicited by Reynolds' attorney.  The fact that a letter that was requested by a claimant's attorney is not a legitimate reason to reject the reliability of it.  *Reddick v. Chater,* 157 F.3d 715, 726 (9th Cir. 1998).

The ALJ also rejected the medical source statement completed by Dr.  Richardson which noted Reynolds had severe limitations in some functional areas, primarily related to concentration and memory.  Dr.  Crossen found Reynolds was only moderately limited in those areas.  The ALJ noted that Dr.  Richardson checked boxes on the medical source statement and his report did not reflect the limitations noted.  Although the medical source statement completed by Dr.  Richardson does contain checked boxes, it was completed in the context of detailed psychological testing and reports.  Tr.  322.

The ALJ also stated the record did not support Dr.  Richardson's assessment.  Dr.  Crossen testified,

Q:  What do you find the B criterion for ADLs?
A:  Mild.
Q:  Social?

A:  Probably mild to moderate.  The limitations there would be primarily in dealing with the general public.  Otherwise, I wouldn't see that the social limitations were very strong.

Q:  How about concentration, persistence and pace?

A.  Well, moderate.  There's not been any episodes of decompensation.

Q:  I have started out with a limitation of simple, routine tasks with little variation in job duties, and then it sounds like you also thought there should be limited or no interaction with the general public?

A:  Limited.

Q:  No close interaction?

A:  Right.  Wouldn't want to put him in a position where he had to do, you know, some problem solving with somebody, something like that.

Q:  What limitations from the organic disorder would you find?

A:  There, I think, we've got the memory problems, and, you know, being able to remember and carry out detailed tasks, and also probably the ability to do them quickly and to plan how to carry out complicated tasks.

Tr.  319-320.  The ALJ stated she gave great weight to the Dr.  Crossen because he reviewed the record and, "given the claimant's over reporting and omissions in Dr. Richardson's interview, the medical expert is best situated to determine" Reynolds' limitations.  The main difference between Dr.  Crossen's opinion and Dr.  Richardson's opinion is whether Reynolds is moderately or severely limited in his concentration, persistence and pace.  The ALJ is required to give at least legitimate and specific reasons based on substantial evidence in the record for rejecting Dr.  Richardson's opinions.

The ALJ has not provided sufficient reasons for rejecting the opinion of Dr.  Richardson.  Her assessment of his examination reports focused on her disagreement with the medical opinion and disregarded the extensive psychological testing performed by Dr.  Richardson.  In relying on "omissions and over reporting" she has not examined the whole of the evidence but looked for inconsistencies out of context with the record as a whole.  The ALJ erred in her assessment of Dr.

Richardson's opinions and thus in the development of the RFC. The case must be reversed and remanded.

## **REMAND**

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000), *cert denied*, 531 U.S. 1038 (2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is not sufficient to support the Commissioner's decision. *Rodriguez v. Bowen,* 876 F.2d 759, 763 (9th Cir 1989).

Improperly rejected evidence should be credited and an immediate award of benefits directed where

> (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

*Harman v. Apfel*, 211 F.3d at 1178, (citations omitted). The third prong of this test is actually a subpart of the second. *Id.* at 1178 n 7.

Reynolds argues crediting Dr. Richardson's opinion as true requires a remand for benefits. The court agrees. Dr. Richardson opined that Reynolds has a substantial loss of the ability to understand, remember, and carry out simple instructions. Reynolds is 52 years old and is unable to perform any past relevant work. Reynolds cites SSR 85-15, which states,

> The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work

situations; and to deal with changes in a routine work setting.  A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base.  This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

Example 1:   A person whose vocational factors of age, education, and work experience would ordinarily be considered favorable (i.e., very young age, university education, and highly skilled work experience) would have a severely limited occupational base if he or she has a mental impairment which causes a substantial loss of ability to respond appropriately to supervision, coworkers, and usual work situations.  A finding of disability would be appropriate.

SSR 85-15, 1983-1991, 1985 WL 56857.  While SSRs do not have the force of law, they are binding

on all components of the Social Security Administration.  20 C.F.R. § 402.35(b); *See, Heckler v.*

*Edwards,* 465 U.S. 870, 874 n. 3 (1984).  Crediting Dr. Richardson's opinion would require the ALJ

to find disability.  The court does not need to examine the remaining issues raised by Reynolds.  The

case is reversed and remanded for an immediate award of benefits.

**<u>CONCLUSION</u>**

Based on the foregoing, the ALJ's decision that Reynolds does not suffer from a disability within the meaning of the Social Security Act is reversed and remanded for an immediate award of benefits.

DATED this ___6<u>th</u>___ day of August, 2007.


     /s/ Garr M. King          
Garr M. King
United States District Judge